Pages 1 - 45

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO, JUDGE

```
BROADCOM CORPORATION, et al.,      )
                                   )
              Plaintiffs,          )
                                   )
   VS.                             ) NO. 19-cv-024238 JD
                                   )
NETFLIX, INC.,                     )
                                   )  San Francisco, California
              Defendant,          )
                                   )
_____)
```

Tuesday, December 22, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:  (By Zoom Webinar)

For Plaintiffs:

        THOMPSON & KNIGHT LLP
        1722 Routh Street
        Suite 1500
        Dallas, Texas  75201
      BY: **RICHARD L. WYNNE, JR., ESQ.**
          **MICHAEL D. KARSON, ESQ.**


For Defendant:

        KEKER, VAN NEST & PETERS, LLP
        633 Battery Street
        San Francisco, California  94111-1809
      BY: **ROBERT A. VAN NEST, ESQ.**
          **SHARIF E. JACOB, ESQ.**
          **MATTHIAS A. KAMBER, ESQ.**


Reported By: **BELLE BALL, CSR 8785, CRR, RDR**
         Official Reporter, U.S. District Court

**Tuesday, December 22, 2020**                          **11:00 a.m.**

                          **P R O C E E D I N G S**

          **THE CLERK:**  Calling Civil 20-4677, Broadcom

Corporation et al. versus Netflix, Inc.

     Counsel for the plaintiff, Richard Wynne?

          **MR. WYNNE:**  Richard Wynne of Thompson & --

          **THE CLERK:**  You are on mute.

          **MR. WYNNE:**  -- Knight, ready to proceed.

          **THE CLERK:**  Michael Karson?

          **MR. KARSON:**  Michael Karson on behalf of the

plaintiffs in from Thompson & Knight, ready to proceed,

Your Honor.

          **THE CLERK:**  Counsel for the defense, Robert -- Robert

Van Nest?

          **MR. VAN NEST:**  Good morning, Your Honor.  I'm here

with Matthias Kamber and with Sharif Jacob.

          **MR. JACOB:**  Good morning, Your Honor.

          **MR. KAMBER:**  Good morning, Your Honor.

          **MR. VAN NEST:**  Nice to see you.

          **THE COURT:**  Nice to see you.

     All right.  Is that it?

          **THE CLERK:**  That's everyone, Your Honor.

          **THE COURT:**  Okay.  All right.

     Well, here's what I'd like to do today.  So, the briefs

were useful and informative.  Thank you for that.  And there

1    was plenty of it.  You all got some extra pages, which is

2    almost certainly not going to happen again.  So I hope you

3    enjoyed it.

4          Let me start with the plaintiffs.  So I'm happy to hear

5    whatever you would like to say.  I do have some things to

6    cover, though, and then you can add anything you would like.

7          Who is taking the lead for the plaintiff?

8            **MR. WYNNE:**  Your Honor, is this on the motion to

9     dismiss?

10            **THE COURT:**  Yes.

11            **MR. WYNNE:**  Michael Karson will be taking the lead on

12     the motion, Your Honor.

13            **THE COURT:**  Okay.  All right.  Mr. Karson.  Let me

14     just share with you what I'm thinking.

15          You all are from Texas?  Is that where you are?

16            **MR. KARSON:**  Yes, Your Honor.

17            **THE COURT:**  Okay.  I spent a fair amount of time in

18     the Eastern District of Texas.  And the one judge I have

19     didn't share what he was thinking.  This may be more of a

20     California thing, so we're talking among friends here, but

21     here are my questions.

22          You know, after looking at the '079, the '245 and the '992

23     patents, I have to say I came away with the distinct impression

24     that they were really mainly aspirational.  We'd like to -- for

25     example:  We'd like to make sure that we use the most efficient

1  route to get data to consumers.  We'd like to make sure we get

2  the highest quality content or highest quality media to

3  consumers.

4       And, didn't have a lot of detail on track for those three

5  patents, basically no detail on how that was going to happen.

6  So I'd like to hear what it is that's inventive.  We don't need

7  to spend time on abstract right now, I'm okay with that.  But

8  just, what was inventive here?

9       I guess the subquestion for that would be I'm just not

10 seeing how this is an improvement to computer functionality.  I

11 think you suggested that at great length in the briefs.  And it

12 just seems very generic and very conventional to me.  And

13 that's part one, subpart one.

14      And question two is I'm not sure how any of those three

15 patents make it around the Federal Circuit's decision in

16 *Two-Way Media*.

17      So you can take it from there, Mr. Karson.

18           **MR. KARSON:**  Thank you, Your Honor.

19      I would start with the -- one of the issues raised by this

20 motion is the procedural posture in which it comes up.  And on

21 a 12(b)(6) motion, there are factual allegations in our

22 complaint that address some of the questions the Court has just

23 raised with respect to technological problems in the prior art,

24 and the specific technological solutions presented in the four

25 patents that are under review here.  And those allegations are

 1   well pled, and should be taken as true.

 2        And we would submit that once those alleged investigation

 3   are taken as true, 12(b)(6) proves to be an imperfect vehicle

 4   for resolving these issues.

 5             **THE COURT:**  Well, let me just jump in on that.

 6        So I am one of the judges that has embraced the

 7   application of 12(b)(6) and 101 motions.  And I'm not alone in

 8   that.  All of those orders that have been appealed have been

 9   affirmed.

10        So I'm not a lone man floating off in a raft in the great

11   Pacific on this.  This is a common approach.  It has its

12   utility.

13        And you're certainly right, well-pleaded allegations get

14   the benefit of the doubt at the pleading stage, and I'm very

15   sympathetic to that.  I don't think cases should be terminated

16   too early.  That's something I don't agree with.

17        On the other hand, the benefit of a patent case is that

18   you have the patent attached to the complaint.  And I can turn

19   to that.  And I'm not saying this is at all a legal

20   determination, but when there is a patent in your hand, you

21   look at that first.  And that's going to carry the day to a

22   large measure, regardless of what the allegations are in the

23   complaint.

24        So all of my questions are driven by my review of the

25   patents.  And that's what I would like to hear a little bit

1  more about.

2          **MR. KARSON:**  Yes, Your Honor.

3      With respect to -- let's take them one at a time.  Let's

4  start with the '079 patent, if that is all right?

5          **THE COURT:**  Sure.

6          **MR. KARSON:**  With respect to the '079 patent, as

7  noted in the briefs, you know, plaintiffs contend that the

8  claimed method in claim 1, for example, is similar to -- and

9  frankly even less abstract than that described in *Packet*

10 *Intelligence*.  And in particular, the method speaks to

11 balancing data transmission in a very specific way.

12     In *Packet Intelligence*, the Federal Circuit upheld the

13 patent eligibility of a patent that spoke to classifying data.

14     Well, something kind of similar is happening in claim 1 of

15 the '079 patent with respect to the disposing, grouping and

16 determining steps, and then there are additional steps where

17 that data is used to effect the data transmission, and thereby,

18 balance the data.

19         **THE COURT:**  Let me ask you this.

20     What, what do you think the patent means when it refers to

21 a traffic metric representative of a traffic load?

22         **MR. KARSON:**  Your Honor, I would submit, at a high

23 level, that refers to a measure of the congestion or data

24 traffic on a particular network link or collection of network

25 links.  Roughly along those lines.

1          **THE COURT:**  I agree with that.  That makes sense.

2     But what I'm struggling with is I just don't see -- I mean, I

3     see -- the aspirational goal of the '079 patent, it's pretty

4     straightforward from the claims.

5          It's -- you know, just to grab a couple of sound bites

6     here, it's a method for balancing transmission traffic, you

7     know, comprising an analysis of traffic flows, grouping the

8     flows into lists, and then kind of figuring out what's the best

9     way to send it.

10         That's all fine, but I don't see any concrete technical

11    details on how that's going to get accomplished.  And to me,

12    that's closer to *Two-Way* than to *Packet*.

13         So what do you think about that?

14         **MR. KARSON:**  Your Honor, we obviously disagree that

15    this case is close to *Two-Way*.  But I can certainly understand

16    the --

17         **THE COURT:**  No, I'm taking it as gospel you are going

18    to disagree with everything I'm going to say.  You just need

19    to answer -- just tell me, why is this *Packet*, and not

20    *Two-Way*?

21         I'm seeing it the other way around.  So help me understand

22    better what you think.

23         **MR. KARSON:**  Your Honor, we would point to the -- the

24    claims are closer to *Packet Intelligence* in that it is

25    affecting the communication, itself, in the classifying steps,

1    and then resolves detected bandwidth issues in those,

2    responsive to the traffic metric and transmitting steps.

3         I agree that with respect to the -- determining the

4    traffic metric limitation, I agree that that limitation is,

5    itself, broad.  But that doesn't mean the claim as a whole is

6    broad.  The claim requires all of the steps.

7         And once a traffic metric -- and there could be multiple

8    types of metrics -- is determined, then responsive to that

9    metric, the computer network changes the way in which it

10   communicates.

11        And that, we would contend, is closer to the cases like

12   *Uniloc* or *Enfish*, for example, where the court has held that

13   those kind of claims are patent-eligible.

14        **THE COURT:**  You're focusing on steps, which I

15   understand.  But that's kind of what *Two-Way* did, too.  Those

16   are just kind of conventional logical steps, right?  I mean,

17   there's nothing particularly innovative about those steps.

18        And that was sort of one of the flaws in *Two-Way*, is that,

19   you know, the organization of the steps just was nothing really

20   more than what a conventional person or conventional

21   application would lead to.

22        **MR. KARSON:**  If I can make two points, Your Honor.

23        First, one of the issues in *Two-Way* is one of the classic

24   things we see in these computer cases involving *Alice*, where

25   the inquiry kind of turns on whether or not you have a

1   general-purpose computer doing general-purpose things to a

2   method that could otherwise be done in the head, or with pen

3   and paper.

4        And the court has held that the mere fact that you may

5   have a general-purpose computer doesn't doom the *Alice* inquiry

6   from the patent holder's point of view.  But if that

7   general-purpose computer is used to achieve non-abstract aims,

8   then it may still survive an *Alice* inquiry.  We would contend

9   that's what's happening here.

10       **THE COURT:**  Let me ask you this, and then I'll

11   probably hear from your colleagues on the other side.

12       Whats is -- in the '079 patent, what is the specific

13   technical problem that the patent is solving?

14       And what are the -- what are the specific concrete

15   solutions?

16       Okay?  So the keyword there is "specific," for both.

17   What's the problem, and what's the solution?

18       **MR. KARSON:**  Yes, Your Honor.

19       The specific problem was the use of heterogeneous links.

20   The prior art had dealt with homogeneous links in terms of

21   speed or load balancing.  And in the presence of heterogeneous

22   links, there was a need to dynamically load-balance.

23       And that's reflected in the claim specifically at:

24   Determining a traffic metric representative of the traffic

25   load, and responsive to that metric, regrouping the data that

1   you have put into flows to rebalance it among the network

2   links.

3       **THE COURT:**  Okay.  And what's the specific concrete

4   solution?  I mean, what -- what's the technology, what's the

5   algorithm?

6       What's the -- what is the answer to that?

7       **MR. KARSON:**  Well, Your Honor, there are multiple

8   ways that a -- there are multiple traffic metrics one could

9   use.  There are multiple ways one could determine them.  All

10  of those would fall within the ambit of that determining step.

11      In the scope of the entire claim, however, then you would

12  have to take that metric, and the links either on a host or a

13  receiver side, using that traffic metric, could rebalance the

14  data loads across heterogeneous links.

15      **THE COURT:**  Okay.  Who's going to take the lead for

16  Netflix?

17      You're on mute.

18      **MR. JACOB:**  Your Honor --

19      **THE COURT:**  I think I can hear you now.  You're

20  welcome to stand, but if you prefer to sit, that's perfectly

21  fine as well.

22      **MR. JACOB:**  Okay.  Thank you, Your Honor.

23      **THE COURT:**  You've heard my discussion with your

24  colleague, Mr. Karson.  So, what -- anything to add to that?

25      **MR. JACOB:**  I'll just briefly answer the Court's

1    questions.

2         The Court is correct.  The '079 patent claims an

3    invention, an alleged invention, in purely functional language.

4    It's not an improvement to computer functionality.

5         You can take Mr. Karson's description exactly as he gave

6    it.  And it is a non-technical solution to an abstract problem.

7    He's talking about balancing traffic on heterogeneous links.

8    Balancing traffic is exactly what *Two-Way* said was abstract.

9    That was in the holding of *Two-Way*.

10        And heterogeneous links, all that means is that traffic is

11   going at different speeds, down different links.  That's an

12   abstract concept that traffic cops have to deal with every day.

13   So there's nothing inventive in this patent.

14        As for the allegations the complaint, the allegations they

15   rely on are completely conclusory.  And moreover, the

16   allegations are simply directed to novelty.

17        And the Federal Circuit has held time and again that

18   novelty is not the test on 101 --

19             **THE COURT:**  Oh, yes.  Well, that's actually in

20    *Two-Way*, itself.

21        So let me ask you this.  If your colleagues on the other

22   side's interpretation or construction of the '079 patent would

23   stand, how preemptive do you think that would be?

24        And, can you give me some examples of what that might

25   preempt?

1          **MR. JACOB:**  It's absolutely preemptive, Your Honor.

2   And the way you can tell that is by their answer to the

3   question:  What is a traffic metric?  Counsel was unable to

4   give you any answer.

5          Turn to the specification of the patent, itself.  The

6   patent explains what a traffic metric is.  You determine

7   whether traffic is high or low, on the link.  And if traffic is

8   high, you send it to the other link.  That is very preemptive.

9          That is not -- that is not a specific technological

10  improvement to solve a problem arising from computers.  It's

11  just an abstract idea.

12          **THE COURT:**  Now, but put some -- put some real

13  dimensions on -- what would that preempt?  What other

14  application or technology might that preempt?

15          **MR. JACOB:**  It would preempt, Your Honor, any use of

16  balancing traffic on a network.

17          And, you know, the claim, itself, doesn't even include

18  hardware or software limitations.  It just refers to "network

19  links."

20          So now -- just as in *Two-Way*, where the patentee is

21  attempting to preempt directing traffic from high to low

22  traffic lanes on a network.  That's incredibly broad and

23  incredibly preemptive, and not permitted under the Federal

24  Circuit's precedent.

25          **THE COURT:**  Just talking out loud here, but it would

1   seem to me that any other content provider is already doing

2   that.  Right?

3       I mean, everybody is looking for the most efficient way,

4   with the least traffic, to deliver their content online.  So in

5   effect, Broadcom would be claiming ownership of all those

6   techniques.

7       Is that your view?

8       **MR. JACOB:**  I believe Broadcom is attempting to do

9   so, Your Honor.

10      **THE COURT:**  Like buying the internet, isn't it,

11  Mr. Karson?

12      **MR. KARSON:**  Your Honor, I would -- I would

13  respectfully direct the Court's attention to the earlier

14  limitations in the claim as well.

15      I don't think this discussion can be divorced from the

16  requirement to organize the data into flows and flow lists as

17  utilizing the data -- excuse me -- the traffic metric in the

18  claims.

19      **THE COURT:**  Is there any online provider that doesn't

20  already try to do what you're claiming in the '079 patent?

21  Which is find the least -- path of least resistance to getting

22  content to consumers?

23      **MR. KARSON:**  If -- if, Your Honor, if that is what

24  the claim covered, perhaps not.

25      The reason I would respectfully direct the Court's

1    attention to the earlier limitations with the flows and flows

2    lists, that's the kind of data organization to utilize these

3    dynamic load balancing techniques that Netflix uses.  And that

4    is specific to Netflix.  I haven't had an opportunity to

5    investigate other parties who may be infringing, but I have

6    investigated as to Netflix.

7        And when you combine the organization of that data as

8    flows and flow lists, something unique to computer

9    communications, and then apply the methods of the '079 patent,

10    I don't think that that would necessarily preempt all data

11    communications, but it does read on Netflix's products and

12    services.

13            THE COURT:  Well, I understand that.  But you're not

14    saying that's exclusive to Netflix, though, are you?

15            MR. KARSON:  I -- I am unaware of other companies

16    that may or may not group data into flows and flow lists.  If

17    Your Honor were to view the claim as covering something as

18    broad as:  Send data across the, you know, best link, as I

19    believe the Court mentioned earlier, that might be broader and

20    cover a lot of entities.

21        But the claim also requires the grouping of data into

22    flows and flows flow lists, and that is something --

23            THE COURT:  Mr. Jacob, you've heard your colleague

24    say that the scope of the patent is far more limited.  It's

25    just flows and flow links.

1          **MR. JACOB:**  If I may briefly address that,

2     Your Honor.

3          We address that in the brief, and the specification is

4     quite clear about what flow and flow lists are.  Flow are the

5     streams of information from one place to another.  And flow

6     lists are lists of those information.

7          And what the claim technology supposedly does is it takes

8     those streams of information, determines whether traffic on the

9     highway on which it is passing is high, and if so, send it down

10    another highway.

11         Just because they -- they've limited it to information --

12    which really isn't much of a limitation, Your Honor -- that

13    does not make it less preemptive.

14         **THE COURT:**  All right.

15    Mr. Karson, let me jump to the '992 patent now.  And the

16    '992 patent is directed to delivering higher-quality media

17    content by detecting and using network connections with greater

18    bandwidth.  So whoever's sending the signal out is trying to

19    figure out:  What's the biggest pipe, so I can get the best

20    product through.

21         Now, that seems even farther away from an improvement on

22    computer technology than the '079, because the express focus of

23    the patent is on the quality of the content delivered to the

24    user.

25         So, is that -- I mean, what do you say about that?

1          **MR. KARSON:**  Well, Your Honor, I would say that the

2    claim is endeavoring to ensure that a user receives the

3    highest-quality content they can.

4          The invention is tied towards quality of service, as you

5    noted.  And I would point the Court to the title.  It's an

6    automatic quality-of-service-based resource allegation.  That

7    automatic quality-of-service balancing and metric is reflected

8    in the claims.  For example, in claim 5, which depends from

9    claim 1.

10         And the -- the claim is specific in that it has to be a

11   portable system.  It has to be using communication bandwidth as

12   determining which connections to use.  And then, the data is

13   specifically limited to video media in claim 2, for example, or

14   audio media in claim 3.

15         And as I noted, claim 5 requires the automatic balancing,

16   automatic performance of these steps.

17         **THE COURT:**  Well, I guess it just raises again for me

18    the question of:  What is the specific solution here?

19         I mean, it again seems very aspirational, and:  Let's get

20   the best quality into the user's hands.  But it doesn't really

21   say a lot about how the problem is being solved.

22         So tell me more about that.

23         **MR. KARSON:**  Yes, Your Honor.

24         The claim 1 refers to, for example, using the network --

25   excuse me -- using the network connection to deliver

1    higher-quality data.  So the bandwidth metric can be obtained

2    through the network connection.  And then, the network links

3    compare which network links and which path will result in the

4    best quality of service.

5         And we believe that the claim as reflected by the Patent

6    Office issuing the claim is specific to that technical problem

7    of automatically balancing quality of service delivered to end

8    users in a portable system.

9         **THE COURT:**  Well, that may be, but -- you can tell me

10    if I'm wrong, but I didn't see any specific method for doing

11    that.  I didn't see an algorithm; I didn't see any special

12    hardware.  I didn't see any special combination of you know,

13    steps out of the ordinary.

14         What's inventive in the solution?

15         **MR. KARSON:**  Well, Your Honor, the inventiveness of

16    the '992 patent is going to rest in the collection of all of

17    those steps together, as the Patent Office recognized.

18         It's the -- delivering the content at the highest-quality

19    service, having determined which two of systems will deliver a

20    better quality of service as to the end user.  And then,

21    automatically determining which of those systems will deliver

22    the highest quality of service.

23         I would respectfully submit that the how that's done, it

24    may not be as specific an algorithm as Netflix would desire or

25    suggest to this Court is required, but the how is in the

1   claims, in those steps.

2          THE COURT:  Let me ask you this.

3      What do you think a portable -- what's a couple of

4   examples of a portable system?

5          MR. KARSON:  A portable system could be something

6   capable of moving.  So for example, it could be a user device

7   like a cell phone or a tablet.  It could be a laptop.  It

8   could be a portable dongle or a portable accessory that can be

9   connected to, for example, a TV or a smart TV.

10         THE COURT:  It's kind of an old-school term for

11  "mobile."  Right?

12         MR. KARSON:  I think there are -- there are some

13  symmetries between "portable" and "mobile," yes, Your Honor.

14         THE COURT:  Okay.

15     Mr. Jacob.

16         MR. JACOB:  Your Honor, Mr. Kamber will address this

17  patent.

18         THE COURT:  Okay.  Mr. Kamber.

19         MR. KAMBER:  Yes.  Good morning, Your Honor.

20     With respect to the '992 patent, just to comment on what

21  counsel was saying, the fact that it tries to claim performing

22  this method in a portable system or that it uses communications

23  bandwidth to make the determination does not render this claim

24  any less abstract.  Merely limiting the field of use does not

25  confer eligibility.

1          That's in a number of cases, including the *Affinity Labs*

2     *versus Direct TV* case, which addresses the question of whether

3     portable is a limitation that renders an abstract claim

4     non-abstract.

5          And the answer from the Federal Circuit there was

6     distinctly:  No, that does not confer eligibility.

7          **THE COURT:**  Let me ask you.  Do you have the '992

8      patent handy?

9          **MR. KAMBER:**  I do.

10          **THE COURT:**  Take a look at figure 1.

11          And Mr. Karson, you may want to do the same thing.

12          Have you got figure 1 there?

13          **MR. KAMBER:**  Yes, Your Honor.

14          **THE COURT:**  Okay.  So, this is the flowchart.  And

15      says start -- first system to provide service to user.

16          Question:  Is there a second system accessible?

17          Establish communications between a yes or no box.

18          Establish communication between first and second.

19          Determining whether the second's better.

20          Determining whether the second will give you a better

21     quality for the consumer.

22          And then, you know, picking between 1 and 2.

23          I mean, I'm throwing you a softball here, Mr. Kamber, but

24     what's inventive about that?

25          **MR. KAMBER:**  Well, nothing, Your Honor.  And if you

1    were to look at my outline, I actually meant to start with

2    figure 1, but then wanted to jump into your question.  I mean,

3    figure 1 is the flowchart that corresponds --

4          **THE COURT:**  Do you have it there?  I want to verify

5    -- I'm just kidding.

6          **MR. KAMBER:**  I'm happy to hold it up (Indicating).

7    No, wait, that's the wrong one.

8          **THE COURT:**  You're getting yourself in trouble.  Just

9    go ahead.

10          **MR. KAMBER:**  The point being, Your Honor, I think --

11    this flowchart corresponds exactly to the steps that are

12    claimed in method claim 1.  And this is really capturing it.

13          It's just saying you're receiving -- you're receiving a

14    service.  You're going to look to see if you can get the

15    service any better.  And if so, you're going to switch over to

16    get it.  And I guess the answer is if not, then you won't.

17          That's an abstract idea.  I think it's a textbook example

18    of an abstract idea, under Federal Circuit case law.  It's

19    essentially, as you say, aspirational.  It doesn't say how to

20    do it.  It just says:  If you can get data at a better quality,

21    please do.  And that's not the kind of thing that you can get

22    an invention on.

23          And to say that it uses bandwidth or that that places some

24    kind of limitation on it I think is false.  I mean, the way

25    that the patent specification that we're all looking at right

1  now describes that, in columns 5 and 6, it's essentially any

2  possible way of deciding that the connection is good enough.

3  You can decide whether it's fast enough or whether it's secure

4  enough or whether -- any number of ways to do it.

5      By claiming just this -- the bandwidth or the connection,

6  they're essentially trying to claim any and all ways of making

7  a determination that you can get data in a, quote, "better way"

8  (Indicating quotation marks).

9          **THE COURT:**  Mr. Karson, I would not say figure 1 is

10  helpful to you on patentability.

11      These are all, you know, pretty generic conventional

12  questions that anybody might ask, even without an engineering

13  degree or any skill in the field, about how to get a good

14  signal to somebody.

15      So, what am I missing in figure 1?

16          **MR. KARSON:**  Your Honor, what will come as no

17  surprise to the Court, I disagree with the assessment you have

18  laid out of figure 1, but I certainly can understand how you

19  might get there.

20      I think the claims correspond with figure 1, as well as

21  other components of the specification.  And they speak to the

22  problem of automatically adjusting data to ensure quality of

23  service.  That was something that was a technological problem

24  in the prior art.

25      And the Patent Office recognized both the patentability

1    and novelty -- though I recognize novelty is not the same thing

2    as patent eligibility -- when it issued the claim, in

3    particular, something like claim 5 that claims the automatic

4    balancing of communications to achieve quality of service for

5    the end user.

6         THE COURT:  Well, I mean, as you know in this

7     context, what the Patent Office did or did not do is not going

8     to drive the analysis.

9         I mean, there are some presumptions, of course, and

10   everybody's entitled to that.  But, you know, we're taking

11   another look under a much higher-magnification microscope,

12   which is the case law of *Alice* and its progeny, microscope.

13        Let me go to the '375 patent.  And this one, Mr. Karson, I

14   think you've got some better arguments on.

15        So -- this, to me, I haven't fully made up my mind yet,

16   but the concepts and the problem and the solution identified in

17   the '375 patent look to me as being a little closer to being

18   patent-eligible.

19        I'd like to hear more from you, though, about what -- what

20   are the specific roles contemplated in the patent for the drive

21   and control servers?

22        What are they doing?

23        MR. KARSON:  Your Honor, the drive and control

24    servers are working to coordinate the data signals that are

25    sent to the decoder devices.  The driver server one might

1  think about as a server that's got the content to be

2  delivered.

3       So in some of the specification embodiments it's described

4  as --

5            THE COURT:  Oh, that's the drive server.  Okay.

6  That's where, let's say, the Netflix show is resident.

7            MR. KARSON:  Correct, Your Honor.  That would be kind

8  of the source repository, if you will.

9       And then the control server is coordinating the

10  distribution of the compressed data that was originally

11  resident on the drive server towards the individual decoder

12  devices.  The end users that are receiving those signals.

13       And that's important, because what the patent speaks to is

14  having compressed data streams sent to one or more decoders,

15  and decoding them individually at the one or more decoders,

16  separately.

17       So the control server coordinates that communication and

18  ensures delivery of that content, as described in the

19  specification.

20            THE COURT:  Okay.

21  Mr. Kamber, are you handling this one?

22            MR. KAMBER:  I am, Your Honor.

23            THE COURT:  All right.  I mean, it does not seem

24  unfair to me, as a description of the '375 patent.

25            MR. KAMBER:  Well, it does and it doesn't.  Because

1    what was just described is purely functional.

2        Pointing to the drive server and saying that it's a server

3    that operates as drive to store data, or pointing at the

4    control server to say it's just a server that controls whether

5    or not something is sent, those -- that's a purely functional

6    way of claiming.  There's no -- there's no real meat on the

7    bones here with respect to the claim.

8        And ultimately, I think what it's trying to claim is just

9    compress data and store it, send it to another location, and

10   decode it there.  And it's not claiming how to do that.  It is

11   trying to use some nonce terminology like "a drive server" or

12   "a control server" or "a decoder" to try to make it seem like

13   it's perhaps more than it is.

14       But under Step 1, you don't have to pay attention to that.

15   And under Step 2, you look at whether or not those conventional

16   components are being used in any unconventional way.

17       And the answer here is no.  A drive server is going to

18   store things.  A control server is going to control the sending

19   of that, and a decoder is going to decode it.

20            THE COURT:  Well, I mean, isn't one fair way to read

21     the claimed invention to be something along the lines of, you

22     know:  An architecture that separates the decryption device

23     and the video system to allow for the video to be streamed or

24     demanding from a remote location?

25            MR. KAMBER:  I don't think so, Your Honor.  I mean, I

1   think in this particular case, old video-on-demand systems

2   were also doing that.

3       I mean, sending data from one location to another wasn't

4   the inventive step or the inventive concept here.  Locating the

5   -- the decoder's separate and apart from the encoder, or where

6   it was stored is not a point of novelty; it's not part of the

7   inventive concept here.  You have to look for something more

8   than that.

9           **THE COURT:**  Well, but, I mean, the idea is that

10   you're separating -- you're routing encrypted video data to a

11   remote deencryption server before delivering it to the user.

12   And -- I mean, to me, that's a technical issue.  And there's

13   some effort at a technical solution in that patent.

14           **MR. KAMBER:**  But Your Honor, I fail to see the

15   distinction between that and any other encoded data or

16   decryption.

17       That's how such systems work.  You encrypt it in one

18   place, and you decrypt it in another place.  The point being so

19   that when it's communicated, it is essentially not accessible.

20       And here, they're not doing anything new or different by

21   encrypting data, and decrypting it somewhere else.  That was

22   already in existence.  That -- that, itself, is not an

23   inventive step here.

24           **THE COURT:**  Mr. Karson?

25           **MR. KARSON:**  Yes, Your Honor.

1      You know, I would respectfully submit that my colleague is

2  making mostly a novelty argument, as opposed to a

3  patent-eligibility argument.

4      I think that potentially raises fact issues which, on a

5  12(b)(6) motion, should be resolved in favor of plaintiff.

6          **THE COURT:**  Well, we started off as saying novelty is

7   not the inquiry under 101.  So --

8          **MR. KARSON:**  I agree.  And that's why I think some of

9   that discussion isn't going to be particularly helpful.

10      We set forth in the brief -- and I'm not going endeavor to

11  say it here again both because it will be a waste of time and I

12  don't it justice, but I do think the *Amdocs* case is very close

13  to this one.

14          **THE COURT:**  I was reading a line that I didn't

15   attribute to *Amdocs*.  That line I read was actually from

16  *Amdocs*, which is about the servers.

17      The "separating decryption device from the video system to

18  allow for video to be streamed on demand," that was from

19  *Amdocs*, at Page 1301.

20      So, yes.  I agree with that.  So tell me more.

21          **MR. KARSON:**  Well, I think that the *Amdocs* case sets

22   forth, both on *Alice* Step 1 and 2, how the '375 patent is

23   patent-eligible.

24      What we've got is not something quite as simple as data is

25  stored somewhere, delivered somewhere else, and decoded.  We've

 1   got requirements for compressed data streams on the drive

 2   server.  We've got requirements that the compressed data stream

 3   be delivered to multiple decoder devices, and be decoded

 4   separately by the decoder devices.

 5       Those are all specific technical solutions to a specific

 6   technical problem that the '375 patent was endeavoring to

 7   address, which is how do you provided video-on-demand

 8   systems -- there it was with kind of an emphasis on DVDs -- to

 9   remote locations?

10       And what you've got in the claims is a detailed technical

11   description of how that's done, using the compressed data

12   streams that frankly, as we've noted, is shockingly similar to

13   the Federal Circuit's decision in *Amdocs*, where it was held

14   patent-eligible.

15           **THE COURT:**  So, you know, DVDs have largely gone by

16    the wayside, at least from my experience.

17       So what would be the device now that would be the

18   equivalent of a DVD?

19           **MR. KARSON:**  Well, Your Honor, the DVD would result

20    in a bitstream.  And a bitstream would apply, even in the

21    absence of reading data from a hard-disk DVD in today's

22    environment.

23       And that's what the Netflix system does.  It's got encoded

24   bitstreams of particular segments of programming in various

25   different, you know, resolutions and languages, different

1    subtitle languages, things of that nature.  That stuff gets

2    compressed into an encoded data stream, and delivered

3    throughout the network to multiple end users which are picking

4    off different parts of that bitstream.

5          So the -- while it's true that the title of the patent

6    refers to DVDs and some of the embodiments refer to a DVD

7    bitstream, the claims are not so limited, and those bitstreams

8    would still be applicable in certain commercial embodiments

9    like what we see in Netflix.

10          **THE COURT:**  Okay.

11          Mr. Kamber, any closing thoughts on that patent?

12          **MR. KAMBER:**  Yes, Your Honor.  Two.

13          With respect to this issue of whether it's a novelty

14    question, we're not raising 102 or 103 issues here.  The first

15    step requires whether there's an abstract idea.  The second

16    step is whether there's an inventive concept.

17          And our point here is that there is no inventive concept,

18    because you have here generic components performing their

19    general functions.  And alone or in this ordered combination,

20    they aren't doing anything new or novel.

21          That, I think, brings up the second point, which is:  This

22    case is the opposite of *Amdocs*.  *Amdocs* was using generic

23    components to -- it was found to have an inventive concept

24    because the conventional -- combination of conventional

25    components was found to implement an unconventional

1    technological solution.  They operated in an unconventional

2    manner.

3         There's nothing here unconventional about using a drive

4    server to store something, using a control server to control

5    sending it, and using decoders in different places to decode

6    it.  Those are all standard operations being performed.

7    There's no unconventional solution, as was implemented in the

8    *Amdocs* case.

9              **THE COURT:**  Okay.  We also have a case management

10    portion I want to get to, but that's it for my questions.

11         We didn't -- I don't need to have a deeper dive into the

12    '245 patent.  I'm satisfied with where we are.

13         But let me just start with Mr. Karson.  Any closing

14    remarks, and anything you would like to add?

15              **MR. KARSON:**  Your Honor, I appreciate the opportunity

16    to talk with you on this today.  I would add just one comment.

17         You know, I started off my presentation commenting on the

18    12(b)(6) standard.  And while I agree with Your Honor there are

19    certainly some circumstances where it can be appropriate to

20    decide a 101 issue on a 12(b)(6) context, I would respectfully

21    submit to you this is not one, because of the specific

22    allegations in this specific first amended complaint.  And I

23    think that's going to apply to all the patents.

24         Unless you have any further questions --

25              **THE COURT:**  Tell me what you think your best example

1   is.  What would preclude my just reading the patents and doing

2   the usual 101 analysis?

3        **MR. KARSON:**  Well, I think you see this for -- I

4   would respectfully direct the Court's attention -- let me

5   focus on the '375 patent, but I think we could do this for all

6   of them.

7        If you were to look at the first amended complaint, Docket

8   52, Paragraphs 166 through 172, I think -- and you'll find

9   similar paragraphs like these for all four of these patents.

10  They describe the problems in the prior art, the technical

11  hurdles that the inventors were trying to overcome, the

12  solutions that they came up with as reflected in the claims.

13  And all of those factual allegations are well-pled.

14       I appreciate Netflix asserts that they are conclusory.  We

15  would respectfully disagree.  They don't offer any reason why

16  they think they're conclusory.

17       **THE COURT:**  Why would that preclude a plain reading

18  of the patent?  Why -- I just -- this is what I -- I mean

19  every complaint, because Rule 8 now applies to patent

20  complaints, every complaint has to have a plausible claim of

21  infringement.  So, I'm not saying you don't have one; you do.

22  But, you know, you reach for the patent first and foremost

23  when you're looking at eligibility.  Not what the lawyers say

24  in the complaint that the patent is attached to.

25       Now, you're absolutely right.  There are certain

1   situations where there might be a fact issue that would

2   preclude that from being resolved in 12(b)(6).  But you know,

3   just talking about:  Oh, here's some prior art, and it's stuck

4   at the 20-yard line and our patent is taking it to the 50-yard

5   line, I don't see how that's inconsistent with going forward

6   and resolving a 101 question at this stage.

7           **MR. KARSON:**  Your Honor, I would simply submit that

8    on the 101 question, itself, perhaps it is not.  I would say

9    the procedural mechanism that Netflix has elected to use to

10   attack and raise the 101 issue here causes those additional

11   hurdles.

12       If, for example, this came up in the context of summary

13   judgment, perhaps that wouldn't be an issue, and the Court

14   would properly and immediately and all the parties would go

15   straight to the patent.

16       In a context --

17           **THE COURT:**  I guess I'll put a finer point on it.

18   Just if you can -- and I'm not trying to put you on the

19   spot -- but name one fact dispute that you think would

20   preclude a 12(b)(6) motion at this time.  As precisely as you

21   can.  Just one fact dispute.

22           **MR. KARSON:**  I'm sorry, Your Honor, let me ask a

23   clarifying question.

24       Do you mean with respect to the specific allegations we

25   have?  Or are you talking --

1          **THE COURT:**  Yes.  In the complaint.  Yes.

2          **MR. KARSON:**  Yeah.  So for example, I would point to

3     Paragraph 170 and 172 with respect to the '375 patent.

4          **THE COURT:**  170 and 172.  Okay.

5          **MR. KARSON:**  Yes, Your Honor.  And as I mentioned, I

6     think there are paragraphs like that with respect to all four

7     of these patents.

8          **THE COURT:**  And what's in 170 and 172 that you're

9     particularly looking at?

10         **MR. KARSON:**  Well, Paragraph 170 talks about the

11    specific ways that that the '375 patent has claimed a solution

12    to technical problems using:  Video-on-demand system that's

13    centrally managed.

14         And Paragraph 172 in particular comments on the novel

15    solution involving the drive server presenting multiple

16    compressed video streams, and delivering those streams to

17    multiple decoders in a remote location.

18         I think those kind of specific allegations which are borne

19    out of the specification, borne out of the inventions, and the

20    development of these inventions as borne out of the claims, I

21    think -- I would respectfully submit that the Court has to

22    grapple with the well-pled factual allegations at this stage,

23    because this is a 12(b)(6) motion.

24         And if we didn't have detailed allegations like those

25    about the inventive concept and the non-abstract nature of

1  these inventions, and instead only met *Iqbal* and *Twombly* on the

2  plausibility standard to show an act of infringement, for

3  example, then in a case like that, a 12(b)(6) motion raising

4  *Alice* issues might be properly disposed of on 12(b)(.

5      6).  But here, there are additional allegations on top of

6  the plausible allegations of infringement.  And I would

7  respectfully submit that those allegations are something that

8  helps plaintiffs on this motion raised in the context of

9  12(b)(6).

10          **THE COURT:**  Okay.  Thank you.

11      All right.  Mr. Kamber, respond to that, and any final

12  comments you have before we move on to the status conference.

13          **MR. KAMBER:**  Sure, Your Honor.

14      I think that these are examples -- Paragraphs 170 and 172

15  with respect to the '375 patent are examples of conclusory

16  allegations, and the type that don't suffice in order to avoid

17  a motion to dismiss on 12(b)(6).

18      In looking at 170, a lot of it doesn't even necessarily

19  make sense.  It talks about a centrally-managed and implemented

20  system, but the decoder devices that are listed there in

21  context of the centrally-managed system are actually, per the

22  claim, remotely located.

23      And then it goes on to say:  Each of these servers can

24  process one or more compressed video steams.

25      The only thing that's actually processing the compressed

1    stream at the end is the decoder device, and not the servers,

2    themselves.  Those are stored, and the sending is actually

3    controlled by the control server.  But there's no processing of

4    those video streams, except at the remote end by the decoder

5    devices.  So these allegations aren't the type that somehow

6    preclude a ruling on 12(b)(6) here.

7         The only other closing thought, Your Honor, is in contrast

8    to the *Amdocs* case, I think I would encourage the Court to look

9    at the *Two-Way* case that you've already mentioned, and the

10   *Affinity Labs* cases which *Two-Way* relies on, to talk about the

11   use of generic conventional components to do generic and

12   conventional things which we think that these drive server,

13   control server and decoder devices do.

14        **THE COURT:**  All right, thank you.  Now, that's a good

15   segue to case management, because I understand there are

16   pending requests for *inter partes* review.  And I'd like to

17   hear more about what the status is.  And when do you think

18   you're going to hear from the PTAB on that?

19        Who would like to start?

20        **MR. VAN NEST:**  I'll address that, Your Honor.  Bob

21   Van Nest.  Good morning.

22        **THE COURT:**  Yes.

23        **MR. VAN NEST:**  Yes.  We have filed IPRs on seven of

24   the patents.  We started in August, and have been filing them

25   consistently since then.  So, given a six-month period to hear

1    by institution, we should be hearing on our first application

2    later on in February.  And then we'll hear more in March, and

3    April, and so on.

4        And one of the questions that I was hoping to get some

5    guidance on from Your Honor is given that, and given that we do

6    anticipate filing some additional IPRs, would Your Honor

7    entertain a stay motion now?  Or would you like to wait until

8    we start hearing from the PTAB, which will be some time in late

9    February of this coming year?

10        **THE COURT:**  Let me -- let me do this.

11        Mr. Wynne and Mr. Karson, do you have any interest in

12   maybe just putting everything on ice until -- about two months

13   now -- until the end of February, at least, for the first

14   tranche of requests to go forward?

15        Or do you -- what would you like do?

16        **MR. WYNNE:**  Yeah, Your Honor, given the posture of

17    the case, we think that actually a stay is not appropriate,

18    even upon institution.  The case has been -- you know, this

19    case was filed back in March of this year, so we've already

20    been -- nine months before we get to the case-management

21    conference.

22        **THE COURT:**  Well, just to jump in, you were in

23    another district for a while.  Is that correct?

24        **MR. WYNNE:**  Oh, I understand completely, Your Honor.

25    But we have -- we're about to get an institution decision or a

1    denial of institution decision, certainly our hope and what we

2    would believe would be appropriate.

3        But, you know, even proceeding, that first one, if that

4    decision is made in February, then the final written decision

5    will come out in February of 2022, which -- you know, the

6    parties worked on a schedule that -- we have an agreed trial

7    setting for this case out in September.  So, you know, we will

8    have a final written decision at least from the first few of

9    these well in advance of, you know, of the trial setting.

10       So, you know, given the situation with the case, in our

11   view, we can run these -- the IPRs, to the extent they're

12   instituted, in parallel with the lawsuit, and get to a decision

13   from the PTAB before we have a trial.  So it's not a situation

14   where, you know, you run the risk of getting a jury verdict

15   before you know what the Patent Office does, which I think is

16   part of what the -- you know, granting a stay provides.

17       And, you know, as of right now, there are IPR petitions

18   not on all of the patents, certainly, but only on seven of the

19   patents.  Some of which are the ones that we've talked about

20   during this 101 discussion.

21       **THE COURT:**  Well, let me just share with you my

22   general practice.  So I rarely -- in fact, I never have

23   granted a stay pending PTAB's decision on whether to institute

24   an IPR.  That's just too early.  So I don't do that.

25       But I ask, because as your colleague pointed out, you're

only about, you know, say 60 to 75 days out from getting a
decision, and I wanted to give you the option if you thought
you'd just like to hang out for a little bit and see about that
happening, and not burn up your attorneys' fees.  So you don't
want to do that, and I don't stay before PTAB acts.

I will say, though, that as I understand it, it's clearly
not all of the patents and all of the claims in suit, but if
this first round of the IPR petitions is granted, it's going to
be a majority of the patents, and a good chunk of the claims.
And I'm not inclined to have two federal tribunals processing
patents at the same time.  So we will get to that when we get
to it.

But I just wanted to give you a word of prediction that if
IPR is instituted 100 percent down the line on what Netflix has
requested, the odds are, you know, not unreasonable that I will
stay the rest of the case.  But we'll see.  You'll have plenty
of time to tell me why that's wrong, and how we can work that
out and do other things.  But that's a future prediction, based
on past performance.  Okay?  So that's -- that's where that is.
But we'll get to that when we get to it.

Okay.  I'm also just a little concerned about issuing a
101 decision while at least two of these patents and the four
that we've talked about today are going to be -- are part of
the IPR request, Mr. Van Nest?  Is that right?

            **MR. VAN NEST:**  That's right, Your Honor.

1          **THE COURT:**  Okay.  I mean, just, I -- this will not

2     surprise you, but all of us here, including me at the District

3     Judge level are swamped with a huge backlog.

4          Interestingly, although we've had no jury trials, which is

5     an enormous problem, obviously, for public-health reasons, the

6     number of filings has gone up considerably.  I don't have the

7     exact statistics on hand, but there has been a definite

8     increase in the filing of cases.  So we're all doing a lot more

9     with fewer -- fewer resources, and fewer outlets for

10    resolution.  So things are slowing down a little bit.

11         And you know, because we're only 60 days away, I just

12    don't know -- I'm just concerned about resource allocation.

13         **MR. VAN NEST:**  Your Honor, can I just point out one

14     thing?

15         **THE COURT:**  Yes.

16         **MR. VAN NEST:**  I completely agree with your

17     assessment.  We, too, have seen an uptick in filings, so all

18     the lawyers are busy.

19         With respect to the '375 which you and counsel discussed

20    this morning, that is one IPR where we will get a ruling in

21    February.  You're quite right.

22         With respect to the '992, which is the other patent that

23    we discussed -- one of the other patents we discussed this

24    morning, we just filed that IPR on December 14th.  So that

25    one's in a slightly different posture.

1          **THE COURT:**  Oh.

2          **MR. VAN NEST:**  We won't be receiving any word from

3      the PTAB until, roughly, middle of May.

4          So I think with respect to the two that we argued, I think

5      the '992 is subject to quite the same analysis.  I realize it's

6      your work and not mine that I'm talking about, but there is a

7      later trigger on the '992 than there is the '375.

8          **THE COURT:**  So that will be the earliest you'll hear

9      from the -- well, the deadline would be May for the PTAB, for

10     '992?

11         **MR. VAN NEST:**  That's right.

12         **THE COURT:**  Okay.  Well, that makes more sense to me.

13     All right.  Okay.  So, let's just let this ride, then.  I'm

14     not going to stay anything.  We'll see how it goes.

15         And, I'm not at this point going to resolve the issue of

16     how many claims for claim construction per patent.  Let's just

17     see where we are.  If -- you know, if zero to seven of these

18     things get taken up by the PTAB, that's obviously going affect

19     what we do, going forward.

20         If I end up getting at least one *Alice* or maybe both *Alice*

21     orders out -- on both patents, I should say -- that might

22     affect things as well, who knows.  I don't know how that's

23     going to come out.

24         So, the rest of the schedule looks, you know, roughly

25     fine.  Jury trial date in September of 2022, and working

1   backward from that, that all seems okay.

2        So anything else for today, Mr. Wynne?

3        **MR. WYNNE:**  Yeah, Your Honor, there was one other

4    dispute that the parties had, and had pointed out in the

5    case-management statement.  And that was with respect to party

6    depositions.

7        We had agreed on a total number of hours of 70 hours for

8    party depositions.  Netflix wanted to cap the number of

9    30(b)(6) hours at 35.  And so the remainder would have to be

10   30(b)(1).

11       Plaintiffs' view would be that they should be just kind of

12   divided up, you know, all available for 30(b)(6) or 30(b)(1),

13   depending on how Netflix designated its corporate witnesses and

14   things like that, still agreeing to the total limit of 70

15   hours.

16       **THE COURT:**  Look.  I'll hear from Netflix, but you've

17   got 70 hours; you spend those hours any way you want, as far

18   as I'm concerned.  I don't see any reason not to do that.

19       Who'd like to -- Mr. Van Nest?

20       **MR. VAN NEST:**  Well, I think you just ruled,

21   Your Honor.

22       **THE COURT:**  Okay.  Good.  All right.

23       **MR. VAN NEST:**  We're -- we're trying to avoid --

24   we're trying to avoid a situation where the 30(b)(6) is used

25   abusively, to keep people going and going and going.  But I

1   understand what Your Honor's view is.

2          THE COURT:  Well, you know, the solution to that is

3   -- and please, if you already haven't, please, you know, read

4   my standing orders.  All of them, civil and patent.  And my

5   discovery one.  If someone is running amok with 30(b)(6)

6   depositions, you just send me a discovery letter, and I will

7   intervene promptly.

8      So what I typically do is you send in your three-page

9   letter.  There are -- not often, but sometimes I can solve the

10  dispute, just based on that.  I usually, almost always, call

11  for a response a week later.  Then I have you on the phone a

12  week after that.  So within two weeks at the latest, I will

13  have, you know, most of your discovery disputes solved.

14     And of course, if there's a dire emergency, which has

15  happened only twice in the last eight years, you can also call

16  me from a deposition.  My availability for that may be

17  unpredictable.

18     So, I think that's fine.  So, if anybody has a problem

19  with the way the 30(b)(6)s are going, you send me a letter, and

20  I'll take it from there.

21         MR. VAN NEST:  And we all appreciate that,

22  Your Honor.  We all appreciate that.

23         THE COURT:  All right.  Now, did you two select --

24  you want to go to mediation in August, or at least have that

25  be an outer boundary.

1    Have you all selected a mediator, or do you have somebody

2    in mind?

3         **MR. WYNNE:**  We have not selected one.  We had agreed

4    on private mediation.  But we had not selected a mediator yet.

5         **THE COURT:**  Okay.  So, at some point, not now, but

6    some time in the spring, I'm going to ask you to designate who

7    that person is.

8         And I can tell you from my friends who are -- and I'm sure

9    you probably know this better than I do.  But I can tell from

10   you my friends who are doing private mediation, their calendars

11   are backed up like there's no tomorrow.  So you might want to

12   book one sooner, rather than later.

13        Okay, Mr. Wynne, anything else for today?

14        **MR. WYNNE:**  North today, Your Honor.  Thank you.

15        **THE COURT:**  Mr. Van Nest, anything else for today?

16        **MR. VAN NEST:**  Your Honor, I do have one question in

17   light of Your Honor's comments on workload.

18        We're still looking at a 12-patent case.  We have three

19   additional patents we believe are equally vulnerable to 101.

20   We've prepared 12(c) motions.  We would like to file those

21   soon.  But I didn't want to file them without getting guidance

22   from Your Honor.

23        They're all routing patents like the ones we've addressed

24   today.  And we think they are all equally vulnerable to 101.

25   And so we were hoping to file them soon.  We're ready to file

them.  But I didn't want to file them without seeking guidance

from Your Honor as to whether you deem that appropriate, or

you'd like to us wait, or whatever Your Honor's preference

would be.

I think -- I think they would all contribute towards

cutting this case down from 12 patents to something that we

could really manage.

**THE COURT:**  All right.  I appreciate that.  Look,

we're going to think out loud among friends here again, now.

Option A, we'll just say -- you all didn't agree on an

interim stay, just a short one of 60 days.  So, docket's wide

open in that respect.  And that's sort of the price of not

having (inaudible) that things will go forward.

Option B is wait until I get my decision out on these two

patents because it may provide guidance -- I don't know what

the other three patents are, but if they're in the same kind of

conceptual family, that order may provide significant guidance

on whether or not you want to go forward with another round.

Option 3 would be just wait until after IPR gets started

because -- are those -- are those three other patents in the

IPR request, Mr. Van Nest?

**MR. VAN NEST:**  They are, Your Honor.

**THE COURT:**  Okay.  So maybe -- maybe, you know,

Option C would be just wait until PTAB makes its decision.

Because if they take it up, I am not going to do a 101 motion

 1     at the same time.

 2         And so --

 3         **MR. VAN NEST:**  I like Option B.  Option B would be

 4     wait and see your order, and go from there.  That seems like a

 5     logical thing to do.

 6         **THE COURT:**  All right.  It's obviously with no

 7     prejudice to your 12(c) motion, so don't -- it's not going to

 8     be deemed late or untimely or anything, so don't worry about

 9     that.

10         Mr. Wynne, do you have any push-back on that?

11         **MR. WYNNE:**  No, Your Honor.

12         **THE COURT:**  Okay.  And I like to say this in all of

13     my business-to-business cases, this is the kind of thing that

14     he businesspeople work out all the time.  So don't wait until

15     August to get your talks started.

16         These are, you know, high-stakes issues, and it goes to

17     the core of some people's business models, and it's the kind of

18     thing that I'm sure you could work out.  And I hope you've had

19     some discussions.  I'm obviously not part of them.

20         But, don't wait on me to order things.  Pick up the phone

21     and talk whenever you are ready do that.

22         Okay?

23         **MR. VAN NEST:**  We appreciate that, Your Honor.  Thank

24     you.

25         **THE COURT:**  Thanks, everyone.  Have a good holiday

1   break.

2           **MR. KARSON:**  Thank Your Honor.

3           **MR. KARSON:**  Thank Your Honor.

4       **MR. VAN NEST:**  Thank you.

5       **MR. JACOB:**  Good morning.

6   (Proceedings concluded)

### CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Monday, January 4, 2021