| | |
|---|---|
| Richard L. Wynne, Jr.<br>HOLLAND & KNIGHT LLP<br>1722 Routh Street, Suite 1500<br>Dallas, Texas 75201<br>Attorneys for Plaintiffs | Sharif E. Jacob<br>KEKER, VAN NEST & PETERS LLP<br>633 Battery Street<br>San Francisco, California 94111<br>Attorneys for Defendant |

June 2, 2022

The Honorable James Donato
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 Golden Gate Avenue
San Francisco, California 94102

      Re:    *Broadcom Corp. et al. v. Netflix, Inc.*, Case No. 3:20cv4677-JD
             Joint Letter Brief Regarding Discovery Issues

Dear Judge Donato:

      After conclusion of the *Markman* hearing in the above-referenced case on May 16, 2022, the Court discussed with counsel for the parties the status of various discovery issues. During the hearing, the Court ordered the parties to confer further on certain disputes, and if those disputes could not be resolved, to address them in a joint letter brief to the Court.

      The parties had two meet-and-confers, one on May 26 and another on June 1. During those calls, the parties were unable to reach agreement on all issues. This letter provides the parties' respective positions on the dispute concerning three issues: (1) Netflix's production of source code for the accused instrumentalities; (2) Plaintiffs' production of documents relating to valuations for the patents-in-suit; and (3) Plaintiffs' production of documents relating to Netflix's patent misuse defense.

Page 1

## I. NETFLIX'S PRODUCTION OF SOURCE CODE

### 1. Plaintiffs' Position

Plaintiffs served their Infringement Contentions under Patent Local Rule 3-1 on January 5, 2021. These contentions addressed all twelve of the patents asserted by Plaintiffs in the live Complaint at the time. Relevant to the current dispute, Plaintiffs' Infringement Contentions provided details about the systems and functions accused of infringing the '121, '387, '663, and '283 Patents that were the subject of the technology tutorial and claim-construction hearing.[1]

On March 9, 2021, Netflix made available for inspection and review certain source code. In large part, the production was limited to open-source code that Netflix claims to use. The parties exchanged correspondence regarding the status of the production. No resolution was reached.

On May 2, 2022, the day of the technology tutorial, Netflix made available for inspection at its counsel's office certain additional source code. During the discussion with the Court on May 16, Netflix's counsel suggested that this supplemental production would moot the dispute over Netflix's source-code production. Plaintiffs' expert reviewed the source code relevant to the four patents currently at issue Netflix has made available, including the May 2 supplement.

On June 1, 2022 (the day before the filing of this letter brief), Netflix made available *some* of the missing source code relevant to Plaintiffs' Infringement Contentions. Although Plaintiffs requested that Netflix agree to extend the deadline for filing this letter brief to allow Plaintiffs' expert time to explore fully this supplemental production, *Netflix refused*. Accordingly, this letter brief is filed based on the preliminary inspection of numerous files made available only recently.

Based on Plaintiffs' review, Netflix's recent productions of source code do not address all of the functionality accused of infringement in Plaintiffs' Infringement Contentions, and thus, Plaintiffs request the Court's assistance in compelling Netflix to produce the relevant code.

### A. The '121 Patent

Plaintiffs seek production of the following source code under Patent Local Rule 3-4, as this information is necessary to show the operation of the accused instrumentalities for the '121 Patent:

| Relevant Netflix Source Code Not Produced | Reference to Accused Functionality in Plaintiffs' Infringement Contentions |
|---|---|
| **Cache Control Service (CCS).** Top-level code and all relevant parts of this module involved in receiving reports from the OCAs on health status, learned routes, and available files; and involved in providing stored information about the OCAs to Steering Service/CODA. | *See, e.g.*, Plaintiffs' Supplemental Preliminary Infringement Contentions, pp. 4-5, 8-9 (attached hereto as **Exhibit A**). |
| **Steering Service/CODA.** com.netflix.streaming used in the Steering code; the top-level code and all relevant parts of this module involved in determining the contents of the playback manifest, including "pick[ing] OCAs that the requested files should be served from, generat[ing] URLs for these OCAs, and hand[ing] the URLs over to the playback application services." | *See, e.g.*, Plaintiffs' Supplemental Preliminary Infringement Contentions, pp. 4-5, 8-9 (attached hereto as **Exhibit A**). |

---

[1] This letter does not address Netflix's production of source code relating to other patents that were stayed pending IPR or subject to an order of dismissal under Section 101.

Page 2

| Relevant Netflix Source Code Not Produced | Reference to Accused Functionality in Plaintiffs' Infringement Contentions |
|---|---|
| **Playback Apps/Playback Application Services.** Top-level code and all relevant parts of this module involved in generating and delivering the playback manifest, including receiving the CDN URLs from Steering Service/CODA and handing over the manifest information and URLs to the client device. | *See, e.g.*, Plaintiffs' Supplemental Preliminary Infringement Contentions, pp. 4-5, 8-9 (attached hereto as **Exhibit A**). |
| **All portions of the Control Plane Service not covered above that are involved in directing OCA fill behavior** (e.g., to add new files to the OCAs). | *See, e.g.*, Plaintiffs' Supplemental Preliminary Infringement Contentions, pp. 3, 12-13, 35, 40 (attached hereto as **Exhibit A**). |
| For all files with accused functionality, Netflix needs to produce the call stack showing when and how the file is executed, and all the imports and dependencies required to understand that code.<br><br>Netflix should also be required to produce all relevant parts of the CCS, Steering Service/CODA, and Playback Apps source code that communicate with each other for purposes of the functionality described above. | *See* **Exhibit A** — on pages referenced above for accused functionalities. |

As the Court is aware, Plaintiffs' '121 Patent relates to a video-distribution network that includes a dynamically configurable display pipeline. For this patent, Plaintiffs accuse Netflix's Open Connect content-delivery network (CDN), which is the network through which Netflix stores and distributes video titles in its catalog to Netflix subscribers. Plaintiffs' Infringement Contentions accuse multiple aspects of the Open Connect network of infringement. Specifically, Plaintiffs assert that the aspects of Open Connect that are used for delivering video content from Netflix's Open Connect Appliances (OCAs) to Netflix subscriber devices infringe the asserted claims of the '121 Patent. In addition, Plaintiffs assert that the portions of Netflix's Open Connect network that are involved in delivering video content *to* the OCAs from other OCAs or storage devices (a process Netflix refers to as "filling") also infringe the '121 Patent. *See* generally **Exhibit A** — Plaintiffs' Supplemental Infringement Contentions chart for '121 Patent.

To date, Netflix has produced some, but not all, source code that is necessary to show the operation of the accused portions of the Netflix CDN. Initially, Netflix limited the production for its OCAs to certain open-source portions of the OCA, namely a FreeBSD operating system portion and a version of Nginx as well as a handful of files that were made available without any context as to how they apply or fit in the overall source-code structure. On June 1, 2022 (i.e., *yesterday*), Netflix finally produced a copy of the firmware image that is actually used in Netflix's OCAs.

Critically, however, Netflix has not made available for inspection the code for three services in Plaintiffs' infringement contentions that perform the steps of forming and dynamically configuring the display pipeline. Plaintiffs' Infringement Contentions identify the software running in the Netflix control plane, namely "playback apps," "steering service (CODA)," and "cache control service (CCS)," as performing these functions. As alleged by Plaintiffs, the accused Netflix Open Connect CDN uses each of these services to form and configure the display pipeline Netflix uses to stream video content to Netflix client devices. These services, as well as the accused "fill" functionality, are operated by Netflix within the "control plane" for the Open Connect CDN. Netflix operates this control plane using Amazon Web Services (AWS), but the source code for

the control-plane services was developed by, and is controlled by, Netflix.

All of the functionality for the missing code listed in the table above is specifically identified in Plaintiffs' infringement contentions (**Exhibit A**), and yet, Netflix has thus far not produced the code necessary to show the operation of the functionality of the identified elements of the accused services.

Netflix produced a handful of discrete low-level files relating to the control plane, but without the top-level code for the accused services and fill functions, it is impossible to determine how those lower-level files are implemented within the accused instrumentalities. As such, they do not show the operation of the identified elements of the accused instrumentalities as required by Patent Local Rule 3-4. In restricting its production to what it wants to produce, Netflix is essentially "narrowly defin[ing] what Patent L.R. 3-4 requires, and then announc[ing] that it will not produce information beyond that definition. *See Cryptography Research, Inc. v. Visa Int'l Serv. Ass'n*, No. C04–04143 JW (HRL), 2005 WL 1787421, at *2 (N.D. Cal. July 27, 2005).

Netflix has no basis for refusing to make available the source code for the specific elements identified in Plaintiffs' infringement contentions, including the Cache Control Service, the Steering Service (CODA), and the Playback Apps/Playback Application Services, as well as the other portions of the Control Plane Service involved in directing OCA fill behavior. Netflix misrepresents its production by touting the number of source-code files it has produced. What Netflix fails to admit, however, is that a significant portion of those files relate to patents that have been stayed and open-source code that is not the version of the code actually used by Netflix.

Netflix's references to the out-of-context statements made at the *Markman* hearing are meritless. Following the hearing, in preparing for this letter brief, Plaintiffs analyzed the source code produced by Netflix and the functionality accused in the Infringement Contentions to ensure that this brief was directed to the accused functionality. That is the source code that Plaintiffs have requested but that Netflix refused to produce. Netflix falsely accuses Plaintiffs of requesting "*all* source code related to *systems* responsible for the accused functionality" and  "*all* Netflix backend source code relating to playback," *infra*. On the contrary, the code Plaintiffs request relates **only to the elements and functions specifically identified in the infringement contentions**. In fact, in quoting the code Plaintiffs request, Netflix deceptively omits the fact that the final request is limited to other relevant code "*for purposes of the functionality described above*" (i.e., in the table of accused functionality).

While Netflix wants to now complain about the timing of Plaintiffs identification of this code, it does not deny that *Netflix* produced relevant code *only yesterday* and *Netflix* refused to extend the deadline for this letter brief to see if the parties could reach further resolution. Contrary to Netflix's assertion, Netflix **has not** produced the complete code relating to the Steering Service/CODA or fill operations. And Netflix admits that it has refused to produce **any code** for Cache Control Service or Playback Apps. Plaintiffs' infringement contentions cite Netflix public documents that describe the accused functionality of being performed, among other places, in the Cache Control Service, Steering Service/CODA, Playback Apps, and fill operations. Plaintiffs are entitled to the code for these services, and Netflix's refusal to produce the code is improper. Plaintiffs' infringement contentions identify the elements of Netflix's Open Connect CDN that are accused and describe the accused functionality. Plaintiffs seek the code for that functionality, not all source code for the elements having a "red circle" as stated below in Netflix's facile attempt to distract from its incomplete source-code production.

B.    The '387, '663, and '283 Patents

In its Infringement Contentions for the '387, '663, and '283 Patents, Plaintiffs identify Netflix's encoding pipeline used to encode content in the ITU-T H.264 and/or H.265 format as accused instrumentalities. Initially, Netflix produced certain code for its H.264 encoder but withheld configuration information used by Netflix in the running of such code. Netflix has represented that it is not in possession, custody, or control of the *source code* that Netflix uses to perform H.265 video encoding. Netflix acknowledges that it has *executable code* for an H.265 encoder provided by Beamr Imaging Ltd. Nevertheless, Netflix initially refused to produce any configuration information used by Netflix for encoding in H.265 format using the Beamr encoder.[2]

## 2. Netflix's Position

Broadcom's source code demands reach far beyond any reasonable interpretation of the scope of Patent Local Rule 3-4. Nonetheless, in the spirit of compromise, Netflix produced hundreds of thousands of new files. In response to this proposed compromise, however Broadcom expanded its request for irrelevant code to include everything involved in the Netflix playback process.

The parties' source code dispute arises from Broadcom's misunderstanding of Patent Local Rule 3-4, which requires production of "[s]ource code, specifications, schematics, flow charts, artwork, formulas, or other documentation ***sufficient to show*** the operation of any ***aspects or elements*** of an Accused instrumentality ***identified by the patent claimant in its Patent L.R. 3-1(c) chart***." This narrow tailoring of patent discovery is consistent with the purpose of the Patent Rules of this district, which "require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed." *Monster Cable Prods., Inc. v. Quest Grp.*, No. C 04-0005 MHP, 2005 WL 8165874, at *2 (N.D. Cal. Aug. 8, 2005). The rule does not—as Broadcom seems to believe—permit a plaintiff to engage in wide-ranging discovery into a defendant's source code that is not accused of infringement or to use source code as a cudgel in abusive discovery tactics.

Broadcom accuses Netflix's Content Delivery Network ("CDN") of infringing the '121 patent and certain encoding software of infringing the '663, '283, and '387 patent. To date, Netflix has produced over 1,531,053 files of source code and hundreds of technical documents. This includes the following code relevant to the accused encoding and CDN functionality: source code for Netflix's H.264 encoder; source code for Netflix's client application software; source code for Netflix Open Connect Appliance ("OCA") firmware; source code for Netflix's backend "Steering" service; and a sample URL manifest. Collectively, this production of code represents massive segments of Netflix's technology and already goes far beyond what has been accused by Broadcom in its Rule 3-1 disclosures. The only other code implicated by the encoding patents is the H.265 encoder, which is in the possession of a third party.

Notably, at the recent claim construction hearing, Broadcom essentially admitted that it seeks code beyond the appropriate reach of discovery. It complained "Netflix's position has been that . . . they are only required to provide source code or technical documentation directed to the particular functionality that's called out in the infringement contentions, rather than with respect to the system where that functionality is contained." Tr. 66:3-8. This is tantamount to an admission that Netflix has complied with Rule 3-4, but that Broadcom still wants ***all*** source code

---

[2] On June 1, 2022, Netflix made available for inspection six configuration files pertaining to the Beamr H.265 encoder. Netflix's counsel represented that Netflix would be producing in the future the runtime configuration information for the H.264 encoding processes it uses. Plaintiffs accept at face value counsel's representations, but if the code made available is insufficient, Plaintiffs reserve the right to seek relief from the Court in the future.

Page 5

related to the systems responsible for the accused functionality—not just the aspects accused of infringement. Broadcom's only explanation for this overreach was that it needs to "see how it all fits together." Tr. 66:18-19. The Court was correctly skeptical of this argument, stating "the starting position is typically you get it for the functionality and that's it." Tr. 68:11-13. Accordingly, the Court directed Broadcom "to specifically tell [the Court] what more you want. Like, specifically, 'We need the source code for X,' and tell me why." *Id.* at 16:18-20; Dkt. 212 (ordering Broadcom to "identify the specific source code it seeks from Netflix").

Broadcom subsequent "source code" demands (made on the eve of the deadline for filing this letter brief) flout the Court's directive. On May 27, Broadcom identified three categories of code it believed to be "missing" from Netflix's production, including (i) the complete[3] source code, build environment, and configuration information for the Open Connect Appliance (OCA) firmware images; (ii) configuration and build information sufficient to show which portions of the source code for Netflix's H.264 video encoding software were compiled and deployed; and (iii) runtime configuration information and/or settings for any version of an H.264 or H.265 encoder used by Netflix. Even setting aside that most of these new requests were for "configuration information," not source code, Broadcom did not (and cannot) supply any explanation for ***why*** the code it identified is necessary "to show the operation of any aspects or elements of an Accused instrumentality identified by [Broadcom] in its Patent L.R. 3-1(c) chart." Pat. L.R. 3-4(a). To the contrary, the bulk of Broadcom's requests were completely irrelevant to its infringement contentions in this case. Nonetheless, in a good faith attempt at compromise, Netflix produced the complete source code for its OCA firmware (responsive category number 1) as well as the configuration files in its possession, custody, and control for the H.265 encoder software (responsive to category number 3) by the next business day. In addition, Netflix further agreed to produce documents sufficient to show the runtime configuration and/or settings used by Netflix in connection with its H.264 encoder software, which is responsive to categories 2 & 3.

Rather than acknowledge that its source code request was moot (and that motion practice was unnecessary), Broadcom instead expanded upon its already overbroad demands for irrelevant source code. At 9:15 a.m. ***this morning*** (June 2), Broadcom issued yet another source code request, this time demanding ***all*** Netflix backend source code relating to playback, irrespective of whether such code has anything to do with the functionality accused of infringement—*i.e.*, "generating a playback manifest." In particular, Broadcom 11th-hour request seeks production all Netflix source code relating to its "Cache Control Service (CCS)," "Steering Service/CODA," "Playback Apps/Playback Application Services," "[a]ll portions of the Control Plane Service not covered above that are involved in directing OCA fill behavior," and "[a]ll relevant parts of the CCS, Steering Service/CODA, and Playback Apps source code that communicate with each other." Contrary to Broadcom's representations, Netflix has already produced the complete source code—well beyond what is actually accused—for the "Steering Service/CODA" system, which is the backend service responsible for generating the playback manifest that Broadcom *specifically* accuses of infringement. Similarly, Netflix produced the source code responsible for the "fill" operations identified in Broadcom's

---

[3] As Broadcom separately admitted, Netflix had already produced "the open source portions of the OCA firmware," which included the file server software actually implicated by Broadcom's infringement allegations.

infringement contentions[4] over a year ago, and the code is also part of the OCA firmware code that has been produced. Broadcom's request for Steering and fill code is thus moot.

The remaining backend services identified by Broadcom (*i.e.*, Cache Control Service, Playback Apps) do not perform the accused functionality. Rather, as Broadcom's counsel conceded at the Markman hearing, Broadcom seeks this source code solely for the vague, undefined purpose of obtaining "a complete picture" of Netflix entire backend services as a whole. As the Court recognized, this is improper. Moreover, Broadcom's suggestion that its request is targeted at functionality accused of infringement is baseless. Indeed, in support of its expansive request for source code, Broadcom repeatedly cites to pages 8-9 of its supplemental infringement contentions. As Broadcom admits, that page cites to a publicly available document from Netflix's website that describes "how the playback process works." That page has a diagram that depicts, at a functional level, ***all of the source code*** involved in the playback of Netflix's titles. Broadcom does not contend that each and every aspect of the Netflix playback process actually infringes a discrete asserted claim element of the '121 patent, nor can it. Rather, Broadcom contends that it is entitled to all of that source code because it has drawn a red circle around the entire diagram in its infringement contentions. Patent Local Rule 3-4 and Rule 26 require much more than Broadcom's flimsy proffer.

Netflix has gone above and beyond the requirements of Rule 3-4, and Broadcom cannot, in good faith, claim that it needs anything more to prove its case.

## II. PLAINTIFFS' PRODUCTION OF DOCUMENTS RELATING TO PATENT VALUATIONS AND PATENT MISUSE DEFENSE

### 1. Netflix's Statement

#### A. Broadcom is withholding documents related to the valuations of the asserted patents.

In RFP Nos. 53, 59-60, and 61, Netflix seeks documents concerning (53) " [a]ny valuation of the [p]atents-in-[s]uit or [a]ny [r]elated [p]atents, including without limitation any valuation of any portfolio including the [p]atents-in-[s]uit or [a]ny [r]elated [p]atents as well as other patents"; and (59) "the business or other reasons for and the terms and conditions of Broadcom's acquisition of CA Technologies, formerly C.A., Inc."; (60) "Avago's acquisition of LSI Logic Corporation"; and (61) "Avago's acquisition of Broadcom." Ex. 1 at 11–12.

Broadcom has undergone several corporate acquisitions in recent years, and as a result, the acquired companies' patent assets—including each of the live asserted patents—have been valued by auditors for purposes of public reporting.[5] In each instance, the acquired patents were

---

[4] Contrary to the assertions made for the first time in this brief, Broadcom's infringement contentions **do not** accuse the OCA "fill" process of infringing any element of any asserted claim of the '121 patent. Rather, Broadcom's infringement contentions invoke the "fill" process *solely* in support of the dubious assertion that OCAs "process video information."

[5] Plaintiff Broadcom Corporation, which was acquired by Plaintiff Avago Technologies International Sales Pte. Limited ("Avago"), was the original assignee of U.S. Patent Nos. 8,259,121 and 9,332,283. CA, Inc. ("CA"), which was acquired by Broadcom Inc., was the

Page 7

valued at amounts orders of magnitude lower than the astronomical damages that Broadcom seeks in this action (namely, a worldwide royalty between $274 and $580 million).[6]

For example, at the time of its acquisition, Broadcom owned 3,000 patents which were categorized as "non-core" by "Broadcom Management" because they did not contribute to Broadcom's forecast revenues. BRCM00063662 at -63722. Ernst &Young ("E&Y") performed a "Market Approach" valuation of the non-core patents by comparing the per-patent values of publicly-traded non-practicing entities,[7] concluding that the median per-patent value was merely $15,000. *Id.* Similarly, at the time of its acquisition, CA owned 287 patents which were deemed "surplus" by CA because they did not support CA's revenue generation. BRCM00064058 at -64084. E&Y's "Market Approach" valuation of the surplus patents found a median per-patent value of approximately $9,000. *Id.* at -64095. And at the time of LSI's acquisition, KPMG concluded that the fair value of LSI's entire unlicensed patent portfolio amounted to only $11.3 million. BRCM00064500 at -64577.

The relevance of such valuation information is indisputable. "The amount paid to acquire a company with desired patents, and the amount of the acquisition amount allotted to a particular patent is relevant to the establishment of a reasonable royalty." *Fresenius Med. Care Holding Inc. v. Baxter Int'l, Inc.*, 224 F.R.D. 644, 653 (N.D. Cal. 2004); *cf. Intel Corp. v. Prot. Capital LLC*, No. 13-cv-1685 GPC (NLS), 2013 WL 12313348, at *3 (S.D. Cal. Oct. 2, 2013) (compelling production of third-party documents related to investments into patents as relevant to their valuation and damages). Indeed, the Court stated that "the presumption will be all those [internal valuations] will be produced." Dkt. 216 (Tr. at 78:7–8).

Although Broadcom recently produced the aforementioned valuations, its production remains deficient. To date, Broadcom has produced only the final valuation reports issued by the auditors, and nothing more. Broadcom has produced no internal documents or information that were used to inform the third-party valuations, or any information that would shed light on Broadcom's role in the valuation process or how Broadcom itself assessed the patents. Nor has Broadcom produced any documents upon which it bases its contention that the valuations are irrelevant to the asserted patents, such as documents regarding how the asserted patents were internally classified (*e.g.*, "core" versus "non-core") by Broadcom for purposes of valuation.

Moreover, Broadcom is withholding the deposition transcript of Ryan Phillips, Director and Managing IP Counsel at Broadcom, in another patent-infringement litigation between the parties.[8] While Netflix cannot disclose the contents of that deposition here due to the protective order in that case, Netflix respectfully requests that the Court order Broadcom to produce the transcript, which is responsive to Netflix's requests, along with other relevant documents

---

original assignee of U.S. Patent No. 8,365,183. LSI Logic Corporation was the original assignee of U.S. Patent Nos. 6,744,387 and 6,982,663; Avago acquired LSI Corporation ("LSI").

[6] *See* Plaintiffs' Preliminary Damages Contentions ¶ 94 (Table 11).

[7] Here, Broadcom likewise does not contend in this action that it practices any of the asserted claims of the asserted patents.

[8] The action is *CA, Inc., et al. v. Netflix, Inc.* Formerly Case No. 2:21-cv-00080-JRG-RSP in the Eastern District of Texas, the Federal Circuit ordered that the action be transferred to the Northern District of California. The pleadings for the case are now consolidated in Case No. 21-cv-03649-EMC. Plaintiff Avago is a plaintiff both in this case and in the one currently pending before Judge Chen.

produced to Netflix in the other case. Netflix's requests for valuation documents have been pending for well over a year and have already been the subject of several meet-and-confers and a prior discovery letter brief. *See* Dkt. 179. Netflix accordingly requests that the Court order Broadcom to complete its production of documents concerning the valuations of the asserted patents by a date certain.

### B. Plaintiffs have failed to produce documents related to patent misuse.

RFP Nos. 25, 26, 48, 49, 87, 89, 104, and 110 seek information relating to Broadcom's efforts to condition patent licenses on product deals.[9] *See* Ex. 1 at 9–11, 13; Ex. 2 at 9–10. Such tying arrangements constitute *per se* patent misuse. *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed. Cir. 1997).

Licensing negotiation documents are critical to Netflix's patent misuse defense. Broadcom has tied at least one license to the asserted patents on the payment of certain fees on its chips and on the purchase of separate products. Indeed, Broadcom previously attempted to negotiate such an agreement with Netflix during patent licensing negotiations, whereby Netflix would pay Broadcom—in addition to a royalty—$50 million for *Broadcom's* costs to develop chips that Netflix does not even use and never sought to purchase. BRCM00024298 at -24314. Broadcom euphemistically calls this illegal tax "non-recurring engineering expenses," or "NREs." Although Netflix rejected Broadcom's offer, Broadcom successfully conditioned a patent license with a third party on NRE fees.

Prior to this litigation, Broadcom asserted several of the asserted patents against Amazon in litigation in the Central District of California. The parties settled and entered into a license agreement requiring Amazon to pay Broadcom "an annual license fee and annual NRE [non-recurring engineering] fee." BRCM00000253 at -260. Not only does the agreement provide for the payment of both a license fee and an NRE fee, but the amount of fees Amazon has to pay Broadcom for the licenses is tied to NRE fees. *Id.* at -261.

In light of this evidence, Netflix has repeatedly requested in meet-and-confer that Broadcom produce documents concerning its sales or offers to sell products to patent licensees that are negotiated simultaneously with, as part of the same agreement as, or as part of related agreements to the patent licenses. To date, Broadcom has refused to produce any such licensing negotiation documents, other than a few of purportedly forthcoming documents relating to the Amazon license. But as a starting matter, Broadcom's production is lacking even with respect to the Amazon agreement—for example, Broadcom has not produced any of the supply agreements referenced in the Amazon license. *See* BRCM00000253 at -256. Furthermore, Broadcom unjustifiably draws the line at producing only certain documents relating to the Amazon license. For tying arrangements that are reflected only in licensing negotiation documents, and not on the face of the license itself, Netflix cannot evaluate whether a tying arrangement exists, or whether

---

[9] For example, RFP No. 48 seeks "[a]ll [d]ocuments [c]oncerning [a]ny licenses to [a]ny rights under the [p]atents-in-[s]uit or [a]ny [r]elated [p]atents, including [a]ny such licenses contained in development and supply agreements or other revenue-generating contracts"; RFP No. 87 seeks "[a]ll [d]ocuments [c]oncerning [Broadcom's] plans, programs, designs, or agreements to sell or offer to sell [Broadcom's] products or services to licensees of the [p]atents-in-[s]uit or [a]ny [r]elated [p]atents"; and RFP No. 89 seeks "[a]ll correspondence between [Broadcom] and any licensee of the [p]atents-in-[s]uit or [a]ny [r]elated [p]atents [c]oncerning [Broadcom's] products and services." Ex. 1 at 10, 13.

an impermissible condition was imposed on the licensee during negotiations, without contemporaneous negotiation documents.

Contrary to its representations, *see* ECF. No. 217, Broadcom has not only failed to produce its licenses to Netflix for review, but, in violation of the Court's order, turned away Netflix's counsel and expert when they arrived at counsel's office to review Broadcom's licenses. Without an opportunity to review either the licenses or licensing negotiation documents, Netflix cannot assess the full scope of the misuse, and therefore cannot agree to limit the production to Amazon. Pursuant to Civil L.R. 37-4, Netflix intends to meet and confer with Broadcom to make one final attempt to resolve the dispute without Court intervention. But if Broadcom continues to violate the Court's order, Netflix will have no choice but to file a motion for an order to show cause.

Netflix has reason to believe that there are other licensing negotiations at issue, and that the Amazon license is not an isolated incident. For example, in a license agreement with F5 Networks, Avago and F5 agreed that "[g]oing forward, neither [Avago] nor any of its [affiliates], will, or will attempt to, leverage the withholding of products and services from F5 or its [affiliates], or any other aspect of the [p]arties' business relationship, to coerce any action by F5 or its [a]ffiliates in any litigation." BRCM00054205 at -54209. The parties agreed that any future patent infringement "cases will remain separate from the product and service dealings between F5 and [Avago]." *Id.*

Finally, the deposition transcript of Mr. Phillips, which Broadcom refuses to produce, is likewise responsive to Netflix's patent misuse-related requests. Netflix respectfully requests that the Court order Broadcom to produce that transcript, along with other relevant documents produced to Netflix in the other case.

Broadcom has stonewalled Netflix on its requests for patent-misuse documents for over a year. Netflix accordingly requests that the Court order Broadcom to promptly produce documents responsive to Netflix's patent-misuse requests by a date certain.

2. **Plaintiffs' Statement**

   **A. Plaintiffs have produced or agreed to produce the documents relevant to patent valuations in their possession, custody or control.**

Netflix *concedes* that Broadcom has produced the valuations they seek. Moreover, Broadcom has agreed to search for and produce internal documents that may have been used or generated to support the valuations. Netflix now appears to be manufacturing a dispute where none exists to deflect from its own failures to produce source code.

The crux of Netflix's request is for valuations that were performed in conjunction with year-end accounting procedures; no other valuations—internal or external—of the patents-in-suit exist. On May 6, 2014, Avago Technologies Limited acquired the assets of LSI Corporation, which would have included the '387 and '663 patents; on September 18, 2014, KPMG delivered a valuation of certain acquired tangible and intangible assets and liabilities of LSI (the "LSI valuation"). On February 1, 2016, Avago Technologies Limited acquired the assets of Broadcom Corporation, which would have included the '121 and '283 patents; on December 19, 2016, Ernst & Young LLP delivered to Avago the valuation it performed in conjunction with that acquisition (the "classic Broadcom valuation"). On November 5, 2018, Broadcom acquired the assets of CA, Inc., which would have included the '183 patent; on September 25, 2019, Ernst & Young LLP

delivered a report covering the valuation of certain tangible and intangible assets acquired, and liabilities Broadcom assumed from CA (the "CA valuation").

Each of these valuations was completed by an independent, third-party auditor—either Ernst & Young or KPMG—several months after the transaction they sought to value and each analysis was performed for financial reporting purposes only. Simply put, the valuations were created months after the transactions closed in order to account for the newly acquired assets and liabilities in Avago's, and later Broadcom's, year-end audited financial statements. They were not created to assign a value to the assets—tangible or intangible—prior to the purchase, or to inform the purchase price or terms in any way.

Nevertheless, *as Netflix concedes*, Broadcom has produced the LSI valuation, the Broadcom valuation, and the CA valuation. These documents set forth the business reasons for the transaction, the purchase price for each, and the high-level terms of the acquisitions. Each document describes in detail the methodology that was used to value the various assets. Moreover, although not specifically the subject of Netflix's letter brief, Broadcom will also produce the entirety of each acquisition agreement.

Netflix also contends that "Broadcom has produced no internal documents or information that were used to inform the third-party valuations, or any information that would shed light on Broadcom's role in the valuation process or how Broadcom itself assessed the patents." As an initial matter, Netflix's murky request for documents "that would shed light on" Broadcom's role in the valuation or how Broadcom itself "assessed the patents" fails to identify any specific category of documents with reasonable particularity. Broadcom has agreed to produce non-privileged documents that either party to the transaction may have submitted to the third-party auditors or that either party may have generated in connection with the valuations. These transactions occurred between three years (CA) and eight years (LSI) ago and many of the employees who may have been involved in the acquisition or accounting procedures are no longer with Broadcom. Regardless, Broadcom has agreed to conduct—and is actively conducting—a reasonably diligent search for such information. Broadcom has also agreed to produce any documents that still exist that might indicate how patents were classified by the acquired companies, such as core or non-core for the Broadcom valuation. Should Netflix seek something more or something different, it is incumbent upon Netflix to describe those documents in a manner that would allow Broadcom to perform a reasonable search.

With respect to the deposition of Ryan Phillips that was taken in unrelated patent-infringement litigation, Broadcom offered a mutual exchange of depositions taken of witnesses of both parties in that unrelated litigation and to agree that each could be used in this litigation. Netflix categorically rejected this offer, preferring instead to seek only Broadcom's witness. But again, this is a manufactured dispute. Broadcom has access to the Phillips deposition transcript and explained to Netflix that it would review the transcript and produce any documents Mr. Phillips may have identified therein that would be relevant to the LSI, Broadcom, or CA valuations.

### B. Netflix's requests for alleged "patent misuse" documents are overbroad.

Netflix misrepresents both the state of Plaintiffs' production and the parties' discussions concerning Netflix's alleged "patent misuse" defense. At the *Markman* hearing on May 16, 2022, Netflix's counsel raised this issue with the Court, stating, "And then finally, Your Honor, we're seeking a category of documents relating to patent misuse." Hearing Tr., May 16, 2022, at 78. Netflix's counsel stated that such defense relates to fees included in license agreements. *Id.*

"Patent misuse developed as a non-statutory defense to claims of patent infringement. In the licensing context, the doctrine limits a patentee's right to *impose conditions on a licensee that*

*exceed the scope of the patent right*. Because patent misuse is a judge-made doctrine that is in derogation of statutory patent rights against infringement," the Federal Circuit has cautioned against applying "the doctrine of patent misuse expansively." *Princo Corp. v. U.S. Int'l Trade Comm'n*, 616 F.3d 1318, 1321 (Fed. Cir. 2010) (emphasis added). Typically, patent misuse arises "[w]here the patent is used as a means of restraining competition with the patentee's sale of an unpatented product." *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 493 (1942).

Netflix's misuse defense is wholly without merit,[10] and comes nowhere near the typical patent-misuse scenario. But contrary to Netflix's assertion, Plaintiffs have not refused to produce relevant documents. During the meet-and-confers, Netflix pointed only to Broadcom's 2017 license with Amazon as evidence of patent misuse. Plaintiffs produced that license to Netflix long ago along with all other licenses arising from the assertion of the patents-in-suit. Without agreeing that Netflix's defense had any merit, Plaintiffs agreed to also produce the negotiation materials between Broadcom and Amazon relating to the license that are not contained in email (because email searching is governed by the Court's Standing Order) as well as any related documents that were produced in the *CA, Inc. v. Netflix* matter referenced by Netflix above.

Plaintiffs agreed to produce, and have produced, license agreements where licenses for the patents-in-suit or related patents were negotiated simultaneously with, as part of the same agreement as, or part of related agreements with other business agreements. To date, the relationship between Broadcom and Amazon is the only license that Plaintiffs have found having such an arrangement. To the extent that Plaintiffs locate any other such agreements, they will produce them. And while Netflix complains above that Plaintiffs did not produce the Amazon supply agreements referenced in the Amazon license, it had not previously requested their production, even in the calls leading to this letter. Plaintiffs will produce those supply agreements.

Plaintiffs explained to Netflix during the meet-and-confers that Netflix's request for wholesale production of licenses and negotiation materials without making any proffer of relevance was improper. Should Netflix make a proffer of relevance as to any other license agreement, Plaintiffs can address such a request, but Netflix's request for production of all licenses and negotiation materials without any showing of relevance is just a fishing expedition and not permitted by the federal rules or this Court's rules and practices.

Although Plaintiffs have agreed to produce any non-email negotiation materials relating to the Amazon agreement, negotiation documents are not relevant to a patent-misuse claim if the final license does not include an improper provision. In *Virginia Panel Corp. v. MAC Panel Corp.*, 133 F.3d 860 (Fed. Cir. 1997), the Federal Circuit held that a patentee's "allegedly predatory practices," which included *proposing* (but later revoking on advice of counsel) a licensing agreement conditioned on purchase of unpatented products, *threatening* to void warranties on its products if the products were used with components not made by the patentee, and *threatening* to sue a party's customers who, as government contractors, were not subject to injunctive relief, "**did not constitute patent misuse** because they did not extend [the patentee's] patent rights nor were they unreasonable competitive practices." 133 F.3d at 869 (emphasis added). The license condition "was not a consummated tying arrangement and for that reason was not per se patent misuse." *Id.* at 871. Thus, Netflix's request for all negotiation materials for all licenses premised on its patent-misuse defense is overly broad and legally improper.

---

[10] Amazon was a customer of Broadcom chips at the time the license was entered. The license included a fee for a patent license and a fee for non-recurring-engineering costs associated with the development and customization of chips for Amazon. These fees were appropriate and did not constitute anything close to an improper tying relationship as Netflix asserts.

Page 12

      Finally, Netflix did not mention the F5 Networks agreement during the parties' meet-and-confers, but it is clear from the portions Netflix cites that Broadcom and F5 were making sure that the license steered clear of any conduct that could be interpreted as impermissible. Indeed, Netflix has pointed to nothing in the F5 license agreement supporting its patent-misuse defense.

      Netflix <u>falsely</u> states that Plaintiffs have denied Netflix's counsel and expert access to review its licenses, in violation of the Court's order. Not so. As Plaintiffs described in their Notice of Compliance [Dkt. 217], Plaintiffs made its license agreements available for review by Netflix under the same type of review protocol to which Netflix agreed in the *CA* litigation in order to safeguard third-party confidential information contained in the licenses, but Netflix elected not to proceed with the review. *See* Notice of Compliance [Dkt. 217]. Despite being informed that the license review would not move forward without Netflix's agreement to a protocol to safeguard third-party confidential information as Netflix had done in the *CA* litigation, Netflix's counsel and expert attempted to access Plaintiffs' counsel's office without such agreement. Netflix's stunt caused concern to Plaintiffs' counsel's administrative staff and to building security. Netflix's refusal to agree to (or even discuss) a review protocol to safeguard third-party information demonstrates that Netflix is more interested in creating a dispute than reviewing the licenses.

      Plaintiffs have agreed to produce the non-email negotiation documents for the Amazon license and to produce any licenses for the patents-in-suit (or related patents) that were negotiated as part of or with a separate business agreement. To date, no such other agreements have been located. As for Mr. Phillips' deposition, as stated above, Plaintiffs believe that all party-witness deposition transcripts from the *CA* case should be produced in this action. Netflix refused such a compromise. Accordingly, Plaintiffs request that the Court deny Netflix's request to compel production of documents allegedly related to its patent-misuse defense.

Respectfully submitted,


| *Richard L. Wynne, Jr.* | *Sharif E. Jacob* |
|---|---|
| Attorney for Plaintiffs | Attorney for Defendant |